(C.D. 4843)

IDEAL MUSICAL MERCHANDISE CO., A DIVISION OF IDEAL INSTRUMENT CO., INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 75–8–02145

(Decided February 13, 1980)

*Freundlich, Schwartz & Weinraub* (*Milton J. Freundlich* at the trial; *Jeffrey A. Loeb* with him on the brief) for the plaintiff.

*Alice Daniel*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation (*Sidney H. Kuflik* at the trial and on the brief), for the defendant.

LANDIS, Judge: The question presented in this case is whether the imported merchandise invoiced as "double-drawn horse tail hair"[1] should be classified as "Bow hair" under Tariff Schedules of The United States (TSUS) item 726.20 or as "Other * * *" hair under TSUS item 186.55. There is a significant difference in the tariff rates for if plaintiff's claim is upheld the merchandise is properly entered free of duty.

---

[1] "Drawn" hair refers to that sorted precisely as to length.

Plaintiff claims the proper classification is under TSUS item 186.55, to wit:

SCHEDULE 1. – ANIMAL AND VEGETABLE PRODUCTS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

PART 15. – OTHER ANIMAL AND VEGETABLE PRODUCTS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Subpart D. – Feathers, Downs, Bristles, and Hair

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Hair, and fur removed from the skin, not specially provided for, crude, sorted, treated, dyed, or otherwise processed but not made up into articles:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Other

| 186.55 | Crude, sorted, treated, or both sorted and treated, but not otherwise processed_____ | Free |

Defendant urges that the Customs Service's classification is correct. TSUS item 726.20, under schedule 7, part 3, subpart B, reads "Bow hair." Since the country of exportation is the People's Republic of China, the rates of duty prescribed by the tariff schedules, column 2, apply. General headnote 3(e), "Products of Communist Countries." Thus the ad valorem rate of duty under TSUS item 726.20 is 40 percent.

The issue in this case, simply stated, is whether the imported bulk horsehair has been sufficiently processed to be classified as violin bow hair. On the basis of the testimony adduced at trial, I uphold the defendant's contention and sustain the classification previously made by the Customs Service.

As the decision in this case is dependent on the testimony of the witnesses, the evidence given by the witnesses should be reviewed.

The testimony consisted of two witnesses for the plaintiff and one for the defendant.

Plaintiff's first witness was Mr. Jack Loeb, the president of the plaintiff corporation, Ideal Musical Merchandise Co. He testified he had been in the musical merchandise business since 1945, that he had been involved in all facets of the music industry (R. 8), and that while he has seen horsehair processed into bow hair (R. 13), he had never personally restrung a bow (R. 43). Mr. Loeb described how the horsehair is processed into bow hair, as follows:

> First of all, the hair has to be combed. The short hairs have to be removed from the bundle. It has to be washed, it has to be separated into specific measurements, and it has to be washed in order to prepare it to be used as a violin bow (R. 13).

It is undisputed that the importation in issue is bulk hair, although the plaintiff also introduced coiled hanks of violin bow hair. Mr. Loeb reiterated how the bulk hair is transformed into the hanks:

> As I stated before, this hair, when it comes in this condition, this horse tail hair, has to be separated, the short hairs have to be removed, it has to be combed, washed, and waxed. The ends have to be waxed in order to prepare it. As you notice, the wax tip on the end of the coil of the bow has been—this has been already processed for use on a violin bow, or cello bow, or viola bow, or any bow used for a stringed instrument (R. 17).

Under cross-examination, Mr. Loeb conceded that in some of the catalogs introduced by plaintiff into evidence, bulk horsehair as well as hanks was listed under the category "bow hair" (R. 53, 56). Also on cross-examination, the witness stated that the imported merchandise had not been processed at all (R. 59); yet he admitted that the merchandise was double-drawn, weighed, and bundled for purposes of sale, washed, sterilized, and fumigated (R. 59–60). Mr. Loeb stated he did not know whether the bulk hair had been graded as to color (R. 61). However, in clear contradiction to this, as defendant's counsel pointed out, in response to interrogatories this witness had previously stated the merchandise had been graded as to color. The interchange proceeded as follows:

> Q. Do you know if it has been graded as to color?
> A. No. All I know is that it has been fumigated in order to comply with U.S. Customs requirements.
> Q. I would like to show you plaintiff's response to interrogatory 5, which defendant propounded to plaintiff. The question in interrogatory 5.(a) says: "Describe fully the processing the subject merchandise underwent from the time it was removed from the horse in order to place it in its condition as imported."
> And you state: "Ans.: Unknown to plaintiff in detail except that it was (1) double drawn, (2) weighed and bundled, (3) sterilized or fumigated, and (4) graded as to color."
> A. Well, it is possible. I don't remember that, but it is possible. I know that this has been weighed and bundled because that is the way it is sold.
> JUDGE LANDIS: When the witness says "this," he is referring to plaintiff's exhibit 2 (R. 61).

Mr. Loeb also testified as to what remained to be done to the importation to transform it into bow hair:

> It has to be processed. It has to undergo additional washing, it has to undergo additional sorting, the short hairs have to be removed, the black hairs have to be removed, it has to be treated, it has to be measured, it has to be tied, and it has to be waxed, and then it becomes bow hair, ready to be used in violin bows (R. 71–72).

Plaintiff's second witness was Mr. John Sipko, an employee of the plaintiff corporation. Mr. Sipko works with all musical string instru-

ments, adjusting and repairing them (R. 88, 89), and has done so for over 40 years (R. 89). He repairs bows for professional musicians (R. 92). Mr. Sipko has rehaired many thousands of bows (R. 101).

To the question of whether the importation could be used immediately in a bow, Mr. Sipko answered: "For better bow I have to select it" (R. 90). Subsequently, he enumerated the other processes the bulk hair would have to undergo to be used as bow hair—combing four or five times, tieing, and then burning the end (R. 90–91), and possibly waxing the end (R. 92–93).

On cross-examination, Mr. Sipko explained that the hanks of hair would have to undergo the same processes as the bulk hair in order to be used as bow hair (R. 97–98). On redirect, the witness appeared to testify that the hanks of hair could be used as bow hair without much further processing—but his testimony was not that clear (R. 99). On recross, he stated that there was "not a big difference" in the processing of hanks and bow hair, but again his testimony was uncertain (R. 101–102).

The most persuasive witness was defendant's, Mr. David Renard. Mr. Renard served as head repairer of old instruments, which included responsibility for rehairing and restringing of bows for 20 to 25 years, at the firm of Luthier Rosenthal & Son (R. 104). He had been stringing bows with bow hair since he was about 9 years old. He estimated that he had rehaired some 6,000 to 8,000 bows (R. 104). Mr. Renard has strung bows for many philharmonic men and persons such as Jascha Heifetz, Mischa Elman, and John Corigliano (R. 104–105). Mr. Renard has imported bow hair similar to the importation at bar (R. 105).

Mr. Renard explained how he would string a bow with the imported merchandise (R. 105–106). Significantly, Mr. Renard testified that he would string the hanks of hair just as he would the bulk hair:

> Well, it would be the same way; without taking them off the large bulk. It is the same thing actually, except it is a smaller quantity. It still has to be done over as far as sorting them out, taking out the short hairs and dark hairs and things (R. 106).

In response to a hypothetical question, whether he would charge a higher price for using the bulk hair or hanks, assuming the same amount of hair was used from each, Mr. Renard responded that there would not be a difference in price (R. 110). He added that as far as time was concerned, one might need more time in stringing a bow from hanks than from the bulk (R. 110). I find the following interchange on direct examination also significant:

> Q. Now, if you or I were to cut hair directly from a horse and give it to you, would you be able to place that on a bow?
> A. No.
> Q. But you could use plaintiff's exhibit 2 to string a bow?
> A. Definitely (R. 110).

The most important query and response went as follows:

Q. In your opinion, does the subject merchandise need any further processing to be considered bow hair? That is, plaintiff's exhibit 2?

A. No; it is usable the way it is (R. 111).

Mr. Renard, who was the most credentialed witness, straightforwardly testified that the imported merchandise is bow hair. He stated that the coils of horsehair introduced, which both sides agree is bow hair, would be strung on a bow just as the bulk hair.

On balance, the testimony is heavily weighted in favor of the defendant's position. Of course, as defendant's brief contends, there is a presumption in favor of the Customs Service's classification.

Plaintiff's arguments are unavailing. Plaintiff has argued that the bulk hair is not sufficiently processed to be used as bow hair. Yet defendant's witness, Mr. Renard, specifically testified that the merchandise could be used as is, and plaintiff's witness, Mr. Sipko, seemed to concede the point. Only witness Loeb, who had never restrung a bow, felt that more processing was mandatory.

Plaintiff also argued that only coiled hanks of horsehair, not bulk hair, are used to restring bows. However, the very catalogs introduced by plaintiff demonstrated that bulk hair, as well as coiled hanks, may be categorized as bow hair. Indeed, defendant's witness testified that he preferred restringing with bulk hair.

Finally, plaintiff relies on *B. Feder* v. *United States*, 58 Cust. Ct. 223, C.D. 2946 (1967). In *Feder*, the proper classification of silver-grey horse tail hair was in issue. The merchandise was classified under paragraph 1541(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as "Violin bow hair." Plaintiff urged classification under paragraph 1688 of the 1930 Tariff Act, as "Hair of horse * * * cleaned or uncleaned, drawn or undrawn, but unmanufactured, not specially provided for." The Court sustained the plaintiff's protest. However, the facts are clearly distinguishable from those at bar.

As here, both sides agreed that the importation was horsehair. The issue in *Feder* was "whether, at the time of importation, the horsehair in question had been advanced in condition sufficiently to be considered as violin bow hair as classified or whether the imported horsehair is 'Hair of horse * * * unmanufactured.' " *Feder*, 224. The testimony of record in *Feder* established that the merchandise was covered with kerosene, that approximately 40 percent of the hair consisted of off-color material, dead hair, and hair of improper lengths. In our case, the merchandise was not covered with kerosene, had been double drawn, and only about 5 percent would not be usable as bow hair (R. 111).

Each case must be decided on the facts of record therein. In the instant case, the merchandise represented by plaintiff's ex-

hibit 1 (the importation) is not violin bow hair in the condition as imported. The imperfections therein are many and include various colors, sizes, dirt, and kerosene. Horsehair in that condition is not usable as violin bow hair without extensive processing [58 Cust. Ct., 226–227].

As I have noted, the weight of the testimony here is precisely the reverse. *See United States* v. *J. Gerber & Co., Inc., et al.*, 58 CCPA 110, C.A.D. 1013, 436 F. 2d 1390 (1971); *B. Feder* v. *United States*, 58 Cust. Ct. 223, C.D. 2946 (1967).

Furthermore, the plaintiff has failed to carry its dual burden of proof. Plaintiff must not only show that the Customs Service's classification is erroneous, but must also demonstrate the correctness of the claimed classification. *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970). Plaintiff's claimed classification, TSUS item 186.55, is set out supra. The critical language is: "Hair * * * Crude, sorted, treated, or both sorted and treated, but not otherwise processed." Even plaintiff's chief witness, Mr. Jack Loeb, testified that the imported merchandise had been otherwise processed before entry (R. 60 ). Thus, TSUS item 186.55 would be an improper classification according to plaintiff's own witness.

Finally, plaintiff's exhibits 12–A and 12–B for identification are deemed irrelevant. They were admitted only as illustrative exhibits (R. 39, 81–82), and while this action by the court was proper, nevertheless, as defendant states in its brief:

> * * * even if these exhibits had been admitted for other than illustrative purposes they are totally immaterial and irrelevant with respect to the instant action. Whereas the instant merchandise was exported from the People's Republic of China into the United States in 1974, plaintiff's exhibits 12 A and B for identification originated from Japan and were imported into this country in 1978. The classification by the Customs Service of the imported hair is a separate and distinct action from any other entries subsequently imported * * * (defendant's brief, 27).

For all these reasons, I find for the defendant and uphold the classification of the Customs Service.

Judgment for the defendant will enter accordingly.